IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TENNESSEE
EASTERN DIVISION

TAMARA MASON,

     Plaintiff,

v.                               No. 13-1006

CAROLYN W. COLVIN, Commissioner
of Social Security,[1]

     Defendant.

_____

## OPINION

_____

### *INTRODUCTION AND PROCEDURAL BACKGROUND*

This action was brought by the Plaintiff, Tamara Mason, seeking judicial review of the final decision of Carolyn W. Colvin, Commissioner of Social Security, denying her claim for disability insurance benefits and supplemental security income. On April 1, 2009, she applied for such benefits, alleging disability from February 13, 2009. Her applications were denied initially and on reconsideration. In an order entered July 14, 2011, Administrative Law Judge (ALJ) Barbara Kimmelman denied Mason's claims. The claimant's request for review by the Appeals Council was denied and this action followed.

### *STANDARD OF REVIEW*

It is the task of the Commissioner to determine whether a claimant is entitled to benefits under the Social Security Act. *Sorrell v. Comm'r of Soc. Sec.,* ___ F. App'x ___, 2016 WL 4245467, at *4 (6th Cir. Aug. 11, 2016). A federal court's review of the Social Security

_____

[1]On February 14, 2013, Carolyn W. Colvin became the acting Commissioner of Social Security, replacing Michael J. Astrue.

Administration's denial of a claim for benefits "is limited to determining whether it is supported by substantial evidence and was made pursuant to proper legal standards." *Gentry v. Comm'r of Soc. Sec.*, 741 F.3d 708, 722 (6th Cir. 2014). "Substantial evidence requires more than a mere scintilla but less than a preponderance; substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Miller v. Comm'r of Soc. Sec.*, 811 F.3d 825, 833 (6th Cir. 2016) (internal quotation marks omitted). "This standard presupposes that there is a zone of choice within which the decisionmakers can go either way, without interference by the courts." *Sorrell*, 2016 WL 4245467, at *4 (internal quotation marks omitted). That is, "[i]f substantial evidence supports the ALJ's decision, then reversal is unwarranted even if substantial evidence backs the opposite conclusion." *Turk v. Comm'r of Soc. Sec.*, ___ F. App'x ___, 2016 WL 2641196, at *1 (6th Cir. May 10, 2016) (citing *Bass v. McMahon*, 499 F.3d 506, 509 (6th Cir. 2007)). The reviewing court may not "resolve conflicts in evidence or decide questions of credibility." *Conner v. Comm'r of Soc. Sec.*, ___ F. App'x ___, 2016 WL 4150919, at *4 (6th Cir. Aug. 5, 2016).

To establish eligibility for disability benefits, an applicant must show an inability to engage in any substantial gainful activity resulting from a long-lasting impairment. 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A); *Taskila v. Comm'r of Soc. Sec.,* 819 F.3d 902, 903 (6th Cir. 2016).

> The Social Security Administration processes applications for relief by asking five questions: (1) Does the claimant show she is not engaged in substantial gainful activity? (2) Does the claimant have a severe impairment? (3) Does the impairment meet any one of the items on a list of impairments presumed severe enough to render one disabled? (4) Can the claimant perform her past jobs? (5) Can the claimant perform other jobs that exist in significant numbers in the national economy?

*Taskila*, 819 F.3d at 903 (internal quotation marks omitted). This standard has been described as a "modest" one. *See id.* at 904. "The claimant bears the burden of proof through the first four

steps of the inquiry, at which point the burden shifts to the Commissioner to identify a significant number of jobs in the economy that accommodate the claimant's residual functional capacity." *Kepke v. Comm'r of Soc. Sec.*, 636 F. App'x 625, 628 (6th Cir. 2016) (quoting *Warner v. Comm'r of Soc. Sec.*, 375 F.3d 387, 390 (6th Cir. 2004)).

*RELEVANT RECORD EVIDENCE*

On the date of the hearing before the ALJ, Mason was forty-three years old. (D.E. 7-3 at PageID 64.) She was a high school graduate with past relevant work as a cashier/checker and receptionist. (*Id.* at PageID 55, 64-65.)

Neurologist John C. Collins, M.D., began treating the claimant in October 2002 on a referral from Robert Carpenter, M.D. (D.E. 7-8 at PageID 205.) These physicians were located in Illinois, where Plaintiff apparently lived at the time. In a letter to Dr. Carpenter dated October 23, 2002, Dr. Collins reported that she had suffered from a seizure disorder for approximately fifteen years. (*Id.*) She had been treated with Tegretol and Neurontin, to which Topamax had been added in the late 1990s to help control the episodes. (*Id.*) His examination revealed that she was oriented times three with good memory and calculation, cranial nerves and visual fields were intact, discs were flat and extraocular movements were intact with no nystagmus. (*Id.*) Facial, sensory and motor examinations were normal. (*Id.*) Gait was normal with negative Romberg. (*Id.*) Strength was graded four out of five and reflexes were 2+, symmetrically. (*Id.*) He also stated as follows:

> [Mason] is now on a dose of Topamax 100 [milligrams] twice a day, Tegretol 200 in the morning, 200 at noon and 300 at night, and Neurontin 400 [milligrams] three times a day. She states on these medicines she rarely has any dizzy episodes, which was her aura, and that overall she has had no problem with any seizure problem. She states she has gained some weight. Her last generalized seizure was over seven years ago.

\* \* \*

3

> Since the last time she was followed by neurology, Topamax seems to have been of benefit and we will maintain the Topamax, get an [electroencephalogram (EEG)], and at that point consider cutting the Neurontin. This may help with her weight gain and also Neurontin wasn't beneficial alone with the Tegretol so perhaps we could get her down to two medications. We will try and taper the Neurontin if the EEG is normal.

(*Id.* at PageID 205-06.) Results of a subsequent EEG were normal. (*Id.* at PageID 207-09.) It appears from the records that her dosage of Neurontin remained unchanged until at least 2005.

She presented to Dr. Carpenter on February 16, 2005, complaining of heart palpitations. (*Id.* at PageID 212.) Plaintiff also reported a seizure the previous week, anxiety and insomnia, but no dizziness. (*Id.*) A electrocardiogram (ECG) conducted February 24, 2005, showed normal sinus rhythm and no significant changes during exercise. (*Id.* at PageID 213, 215; D.E. 7-10 at PageID 303-04.) The patient exhibited moderate impaired aerobic capacity at an adequate cardiac workload with normal blood pressure response. (D.E. 7-8 at PageID 213.) The test was negative for ST segment depression. (*Id.*)

Mason returned on May 11, 2005, with complaints of tiredness and numbness of the hands and feet. (*Id.* at PageID 211.) Dr. Carpenter's progress notes indicated that her numbness could be caused by stress, medications or a metabolic problem, and that the fatigue arose from medications or sleep apnea. (*Id.*)

According to the record, Plaintiff began seeing Dr. Luis F. Pagoaga, a family practitioner in McKenzie, Tennessee, in April 2006.[2] (D.E. 7-9 at PageID 219-78.) In response to her complaints of chest pain, a chest x-ray was performed on April 4, 2006, at McNairy Regional Hospital pursuant to Dr. Pagoaga's order, the results of which were normal. (D.E. 7-10 at PageID 285.) An exercise stress test conducted six days later revealed no ST abnormalities or

---

[2]Many of these records are nearly illegible.

arrhythmias.  (*Id.* at PageID 283-84.)  Over the next three years, the claimant was treated by Dr. Pagoaga for various issues, including weight fluctuations, abdominal bloating, hip pain, back pain, hand pain from punching a wall, rashes, muscle pain in the chest, shoulder pain, knee pain, abnormal periods, flu symptoms, stress, diabetes, and head pain after striking a deer with her vehicle.  (D.E. 7-9 at PageID 223-54.)  An outpatient upper gastrointestinal examination ordered by Dr. Pagoaga on June 12, 2006, on Mason's complaints of chest pain showed gastroesophageal reflux.  (*Id.* at PageID 281.)  The testing did not rule out gastritis.  (*Id.*)

X-rays of the cervical spine taken at McKenzie Regional Hospital on October 30, 2007, in response to Plaintiff's complaints of neck pain revealed minimal degenerative disc narrowing and spondylosis at C6, but nothing acute.  (*Id.* at PageID 280.)  In January 2008, Plaintiff discussed her medications with Dr. Pagoaga.  (*Id.* at PageID 239.)  Notes reflected that she had not suffered a seizure since 1995 and that she stopped taking one of the medications because she could not afford the cost.  (*Id.*)  There is nothing in the record to suggest that her dosages were changed or that she reported side effects at that time.  An x-ray was taken of Mason's right hand on December 1, 2008, showing unremarkable bones, joints and tissues, with no fracture or subluxation.  (D.E. 7-10 at PageID 279.)

On February 26, 2009, Mason visited Dr. Pagoaga concerning her medication levels, although it is unclear if there was a problem or if anything was done.  (D.E. 7-9 at PageID 225.)  Chest x-rays taken in connection with complaints of a cough on May 5, 2009, showed evidence of old granulomatous disease and no acute cardiac or pulmonary disease.  (D.E. 7-16 at PageID 548.)  On May 12, 2009, tomography revealed multiple small low attenuation lesions in the cervical region of the uterus, likely nabothian cysts; a two centimeter lesion of the left ovary, probably representing a prominent follicle; and a 6.9 centimeter cystic lesion posterior to the

uterus on the right, possibly arising from the right adnexa and representing a right ovarian cystic lesion.  (D.E. 7-15 at PageID 531.)

According to a Social Security Function Report completed by the claimant on May 7, 2009, her daily activities included taking a shower, watching television, driving a car, shopping for groceries by herself, performing light housework, attending to her personal needs, paying her bills, handling savings accounts and checkbooks, cross-stitching, visiting friends, preparing simple meals daily and washing her own clothes.  She sometimes required help with remembering to take her medication.  (D.E. 7-7 at PageID 172-76.)  Mason advised that she could not lift, squat, bend, kneel or climb stairs because of "real bad headrushes" and dizziness; had a bad memory due to epilepsy; and had trouble completing tasks, concentrating and following instructions as a result of her medications.  (*Id.* at PageID 177.)  She could walk about ten feet before needing to stop for a ten to fifteen minute rest, could pay attention for about thirty minutes, and was easily stressed.  (*Id.* at PageID 177-78.)

On July 1, 2009, Plaintiff was admitted to Milan General Hospital for removal of a heel spur and release of plantar fascia involving the right foot, performed on the same day by Joel Craig, M.D.  (D.E. 7-13 at PageID 382, 394-95.)  At her surgery clearance examination on June 29, 2009, it was noted she had a history of diabetes mellitus that was adequately controlled.  (*Id.* at PageID 385.)  A pre-operative chest x-ray showed mild scoliosis, cardiomediastinal silhouette within normal range, clear lungs and no active process.  (*Id.* at PageID 390.)  X-rays on the foot post-surgery revealed no evidence of residual calcaneal plantar spur.  (*Id.* at PageID 391.)

A Physical Residual Functional Capacity (RFC) assessment completed by medical consultant Louise G. Patikas, M.D., on July 23, 2009, indicated no established exertional, postural, manipulative, communicative, visual or environmental limitations.  (D.E. 7-12 at

PageID 326-34.)  Dr. Patikas noted on the form that no Medical Source Statement (MSS) was in the file.  (*Id.* at PageID 332.)  The consultant commented that the petit mal seizures Mason claimed occurred on a daily basis lasted only a few seconds, there were no physical difficulties during her interview, the MER [(medical electronic record)] failed to support the frequency of seizures alleged and symptoms were only "partially credible," there were some issues with compliance, and the functional restrictions alleged were disproportionate with the clinical findings.  (*Id.* at PageID 333.)  The assessment was affirmed by Denise P. Bell, M.D., on October 12, 2009.  (*Id.* at PageID 335.)

X-rays of the chest and right ribs conducted on September 9, 2009, due to mild pain in the right chest and ribs after her chest "popped" when someone hugged her revealed no abnormalities.  (D.E. 7-15 at PageID 516-18.)  On September 24, 2009, Mason completed a Seizure Questionnaire for the Tennessee Department of Human Services.  (D.E. 7-7 at PageID 197.)  She indicated that she suffered from seizures every day and that her last had been the day she filled in the form.  (*Id.*)  Plaintiff described the episodes as follows:  "I get dizzy and feel like I'm going to pass out.  I pass out sometimes [and] sometimes I black out for a few seconds.  Headlights [and] florescent [sic] lights bring on seizures."  (*Id.*)  In December 2009, she reported during a visit to McKenzie Medical Center an increase in seizure activity and was referred to a neurologist.  (D.E. 7-15 at PageID 504.)  An EEG performed on December 29, 2009, by neurologist Richard T. Hoos, M.D., was normal.  (*Id.* at PageID 498-99.)

Results from a chest x-ray on January 18, 2010, prior to surgery on Mason's left foot revealed normal cardiomediastinal silhouette, clear lungs, and evidence of remote granulomatous disease.  (D.E. 7-13 at PageID 369.)  No change was detected from the previous chest x-ray on June 29, 2009.  (*Id.*)  A lesser metatarsal osteotomy, correction of toe bunion and arthroplasty of

the left fifth digit were performed by Dr. Craig on January 20, 2010. (*Id.* at PageID 373.) A post-operative x-ray of the foot showed expected post-operative appearance following hammertoe correction of the fifth digit. (*Id.* at PageID 370.)

Plaintiff saw neurologist Michael W. Brueggeman, M.D., at West Tennessee Neurosciences on February 18, 2010, for seizure treatment. He reported as follows:

> She states she has always had at least several episodes per day but in the last six months she has been having five or six per day. She describes that she just feels weak and dizzy, most often when she is standing. Sometimes she has to sit down. It will last a minute or two then goes away. She has never really totally blacked out, though she does describe one episode when she just stopped talking for a minute or two. Her boyfriend may have told her of some episodes when she may stare briefly though, again, she did not mention this originally. As best as I can tell, though, she has never had any more generalized tonic-clonic type seizures and has never bitten her tongue. She continues to work and function pretty well in spite of having five or six of these episodes per day. There is no definite family history of seizures.
>
> . . . Patient with atypical multiple episodes every day for over 20 years. Workup I have been able to access did not confirm any definite epileptiform activity on EEGs though, again, she is reported to have had an ambulatory study done years ago which was diagnostic. I discussed with her that it seems very unusual for this to be a seizure disorder, though it is difficult to be certain.

(D.E. 7-15 at PageID 492.) He recommended adjustment of medications and inpatient monitoring at Vanderbilt Epilepsy Center considering the atypical nature of the seizures. (*Id.* at PageID 493.)

A chest x-ray was performed on February 22, 2010, arising from Plaintiff's complaints of bronchitis and neck pain. (*Id.* at PageID 490.) Cardiac and mediastinal contours were within normal limits, lungs were clear without focal consolidation, bones were unremarkable, and there was no pleural effusion, pulmonary edema or pneumothorax. (*Id.*) There was disc space narrowing and spondylitic ridging at C6-C7 without acute findings. (*Id.*)

On April 26, 2010, Gary Fornera, M.D., performed an outpatient dilation and curettage, endometrial ablation and hysteroscopy as a result of Plaintiff's abnormal menstrual bleeding. (D.E. 7-14 at PageID 455.)   Biopsy revealed secretory phase endometrium with no atypia, abnormal glandular crowding or malignancy.  (*Id.* at PageID 474.)

A pre-operative chest x-ray taken on June 1, 2010, showed normal heart size and pulmonary vascularity, clear lungs with no effusion or adenopathy, and unremarkable skeletal structures.  (D.E. 7-13 at PageID 346.)  Mason was admitted to Milan General Hospital on June 2, 2010, for a lesser metatarsal osteotomy to the right fifth metatarsal head as well as arthroplasty of the right fifth digit, performed by Dr. Craig.  (*Id.* at PageID 337-39, 350.)  During a surgery clearance examination on May 27, 2010, it was noted that her diabetes mellitus was adequately controlled, seizures were controlled, and anemia was improved with iron replacement therapy. (*Id.* at PageID 340-41.)   A post-operative x-ray of her right foot revealed that the hardware inserted during the procedure was intact and in satisfactory position.  (*Id.* at PageID 347, 350-51.)

Plaintiff saw another neurologist, Salman Saeed, M.D., of West Tennessee Neurology, P.C., for the first time on July 27, 2010.  (*Id.* at PageID 407.)  A magnetic resonance imaging (MRI) test performed on August 11, 2010, at the request of Dr. Saeed revealed no significant intracranial abnormality and a mucous retention cyst in the floor of the right maxillary sinus.  (*Id.* at PageID 405-06.)   According to progress notes from a follow-up visit with Dr. Saeed on September 28, 2010, Mason's subjective descriptions of her seizures suggested "partial, evolving to generalized tonic-clonic convulsions."  (*Id.* at PageID 403-04.)  Objective findings indicated no neurological abnormalities.  (*Id.*)  She denied driving at that time because she had not been seizure free for the period required by state law.  (*Id.*)  With respect to her medications, it was

noted that she generally used drugs as prescribed and that she suffered no side effects. (*Id.*) Neuronin was not included in the listing of her medications and it is unclear whether she was still taking it at that time. (*See id.;* D.E. 9-1 at PageID 570.) No social impact from her seizures was indicated. (D.E. 7-13 at PageID 403.)

A report from a visit to McKenzie Medical Center on January 17, 2011, recorded left knee pain resulting from a fall in December 2010. (D.E. 7-14 at PageID 415.) Symptoms were described as moderate and exacerbated by motion at the knee, weight bearing, walking, running, kneeling and squatting. (*Id.*) Pain was rated at seven out of ten. (*Id.*) Plaintiff returned on February 11, 2011, because of worsening knee pain. (*Id.* at PageID 411.) Her physical complaints mirrored those described in January except that her pain was rated at a five out of ten. (*Id.*) There was popping and grinding of the knee without edema. (*Id.*) The claimant indicated that she was ready for an MRI as the pain was impacting her day-to-day activities. (*Id.*) There is no indication an MRI was actually performed, however. (*See* D.E. 9-1 at PageID 570.) X-rays showed only mild arthritis. (D.E. 7-14 at PageID 411.)

On a check-box form completed by Dr. Saeed on April 21, 2011, he advised that Mason had complex partial seizures, both convulsive and non-convulsive, daily. (D.E. 7-16 at PageID at 561.) He also related that she was in good compliance with treatment and that she suffered no significant side effects from her medications. (*Id.*)

At the hearing before the ALJ, Mason testified that she last worked as a cashier at a Fred's store until she was fired for missing too much work. (D.E. 7-3 at PageID 64-65.) Her absences -- five or six days per month -- were due to seizures, from which she had suffered since she was eighteen. (*Id.* at PageID 65, 74.) She was placed on medication when the seizures began and, for several years, they were under control. (*Id.* at PageID 65.) When they started

occurring every other day, her doctor changed her medication, which helped for awhile, but the seizures worsened. (*Id.*)

At the time of her foot surgery in May 2010, Plaintiff related that her seizures were under control. (*Id.*) She testified before the ALJ that she had suffered from seizures every other day for the six months prior to the hearing. (*Id.* at PageID 65-66.) Claimant described the episodes, which lasted for two or three minutes, as dizziness with a feeling that she was going to pass out. (*Id.* at PageID 66.) She denied actually losing consciousness. (*Id.*) According to Mason, her seizures were sometimes brought on by driving at night and fluorescent lighting. (*Id.* at PageID 73.) Plaintiff identified her treating physician at the time of the hearing as Dr. Saeed, who examined her last on September 28, 2010. (*Id.* at PageID 66-67.)

Claimant stated that her last major seizure occurred two weeks prior to the hearing while she was at church. (*Id.* at PageID 67.) She admitted to difficulty in obtaining her medications for about a month for financial reasons and was without them for that period. (*Id.*) She resumed taking them regularly approximately a month before the hearing. (*Id.*) When she took her medicines, she had dizzy spells for which she did not seek treatment, but did not experience major seizures. (*Id.* at PageID 68.)

Mason lived with a neighbor, had a driver's license but did not drive, and smoked one-half to a full pack of cigarettes per day. (*Id.* at PageID 68-69.) She described a typical day as taking a shower, doing light housework, sitting on the porch, and occasional cross-stitching and light reading. (*Id.* at PageID 69-70.) When asked what kept her from working, she responded that, because of her foot surgeries and foot pain, it was difficult for her to stand for long periods of time. (*Id.* at PageID 70-71.) She also stated that the seizures took "a lot out of" her and she usually slept for the remainder of the day afterward. (*Id.* at PageID 66.) The next day, she felt

fine.  (*Id.* at 73.)  Despite the foot pain, Mason did not return to the doctor, she claimed, because she had no insurance.  (*Id.* at PageID 71.)  Claimant advised the ALJ that she could stand for two or three hours if she could sit for ten or fifteen minutes every hour or so.  (*Id.* at PageID 70.)  She had no difficulty sitting, walking or using her hands, and could lift and carry ten or fifteen pounds.  (*Id.* at PageID 70-71.)  Mason related that her medications made her forgetful, but she suffered no other side effects.  (*Id.* at PageID 71, 74.)  The medical records reveal that she was a long-time tobacco user.

The ALJ entered into the following exchange with vocational expert (VE) Dr. Gary Sturgill:

A:      . . . Ms. Mason's more recent work has been as a cashier checker, which the Dictionary of Occupational Titles [(DOT)] classifies it [sic] as light, semiskilled work.  Prior to that and for several years she was a receptionist in a medical office.  Receptionists are classified by the DOT as sedentary and semiskilled. . . .

Q:      I'm going to ask you to assume a hypothetical person of Ms. Mason's age, education and work background and further assume that this individual would have no exertional limitations, that she would be required to avoid work hazards, including driving and operating moving machinery and working around heights.

A:      Well, very likely, Your Honor, both past jobs of cashier checker and receptionist would be available.

Q:      And if I asked you to assume a hypothetical person of Ms. Mason's age, education and work background and further assume that this individual could lift 50 pounds occasionally and 25 pounds frequently, could sit, stand and/or walk for up to six hours each in and [sic] eight-hour workday, that she should avoid all work hazards.

A:      Well, again, both past jobs would be available, given that they're at a lower exertional level.

Q:      And if I asked you to assume a hypothetical person of Ms. Mason's age, education and work background and further assume that this individual could lift 20 pounds occasionally and ten pounds frequently, that she could sit for up to six hours and stand and/or walk for up to six hours, but she

could only stand for one hour at a time after which she would require a ten to fifteen minute break of sitting, and she should avoid all work hazards.

A:      Very likely, Your Honor, the cashier checker work would be eliminated by that need to sit; however, I would suggest that the receptionist work would still be available.

Q:      And are there other jobs?

A:      Other jobs, Your Honor, that I believe would allow for that sit/stand, and let me note that the concept of a sit/stand option is not contained in the Dictionary of Occupational Titles. My testimony regarding sit/stand is based on my approximate 30 years in disability work. That being said, other work that I believe would allow for the restrictions you've noted would include counter clerks, which number approximately 1100 [sic] in the state economy and approximately 59,000 in the national economy. A representative DOT code number for counter clerks is 295.367-026. A second example is order clerks. They number approximately 800 in the state economy and approximately 42,000 in the national economy. A representative DOT code number is 209.587-034. A third example is general office clerks. They number approximately 1700 [sic] in the state economy and approximately 82,000 in the national economy. A representative DOT code number is 209.667-014.

Q:      And what exertional level are these jobs?

A:      These are light jobs, unskilled, for persons having 12 or more years of education.

Q:      Okay. And how many absences would be tolerated?

A:      Standard most often cited, Your Honor, is two or more days per month usually results in unsatisfactory employment and likely termination.

(*Id.* at PageID 63, 76-78.) Claimant's attorney asked the VE if there were jobs his client could perform if she expected to be absent more than twice per month, to which Dr. Sturgill responded, "No. As I said, that would eliminate a person's employability." (*Id.* at PageID 78.)

*THE ADMINISTRATIVE DECISION*

Upon hearing testimony and reviewing the evidence, the ALJ determined that, although the claimant suffered from a severe combination of impairments including a seizure disorder,

minimal degenerative disc disease of the cervical spine, bilateral arthroplasties of hammertoes and status post-removal of a heel spur, and noninsulin-dependent diabetes mellitus, she did not have an impairment or combination of impairments that met or equaled in severity the requirements of any listing contained within the Listing of Impairments set forth in the Social Security Regulations.  (*Id.* at PageID 52.)

It was the ALJ's opinion that Plaintiff had the RFC to perform light work, could occasionally lift up to twenty pounds and frequently lift up to ten pounds, walk and/or stand for an hour at a time for a total of six hours during an eight-hour workday, sit for six or more hours during an eight-hour workday, and could not work in hazardous environments.  (*Id.*)  The ALJ concluded that the claimant's allegations of disability were not supported by the record as a whole and that, "[i]n fact, her admitted activities suggest that she would be able to work."  (*Id.* at PageID 55.)  Judge Kimmelman found, based on the record and the testimony of the VE, that she was capable of performing her past work as a receptionist and a cashier checker.  (*Id.* at PageID 55-56.)  Thus, she was not disabled.  (*Id.* at PageID 56.)

## ASSIGNMENTS OF ERROR AND ANALYSIS

The Plaintiff claims the following errors were made by the ALJ:  (1) failure to accord proper weight to the opinion of treating physician Dr. Saeed[3]; (2) failure to properly consider all of her impairments or provide adequate reasons for finding them insufficiently severe; and (3) failure to properly take into account the negative side effects of her medications.  The Court will address these assertions seriatim.

---

[3]The heading for this argument in Mason's brief names her treating physicians as Drs. Rice and Holt.  (*See* D.E. 9-1 at PageID 572.)  The record, however, contains no medical opinions from physicians with those names.  The reference appears to be an error.

<u>Dr. Saeed's Opinion.</u>

An ALJ is required to comply with certain standards in assessing medical evidence offered in support of a disability claim. *Gentry*, 741 F.3d at 723.

> Chief among these [standards] is the rule that the ALJ must consider all evidence in the record when making a determination, including all objective medical evidence, medical signs, and laboratory findings. The second is known as the "treating physician rule," requiring the ALJ to give controlling weight to a treating physician's opinion as to the nature and severity of the claimant's condition as long as it is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the case record. The premise of the rule is that treating physicians have the best detailed and longitudinal perspective on a claimant's condition and impairments and this perspective cannot be obtained from objective medical findings alone. Even when not controlling, however, the ALJ must consider certain factors, including the length, frequency, nature, and extent of the treatment relationship; the supportability of the physician's conclusions; the specialization of the physician; and any other relevant factors. In all cases, the treating physician's opinion is entitled to great deference even if not controlling.

*Id.* (internal alterations, citations & some quotation marks omitted). "An ALJ must provide 'good reasons' for discounting the opinion of a treating source." *Cosma v. Comm'r of Soc. Sec.*, ___ F. App'x ___, 2016 WL 3209500, at *1 (6th Cir. June 10, 2016) (per curiam). "The stated reasons must be supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." *Id.* (internal quotation marks omitted).

It is the position of the Plaintiff that the ALJ's failure to address, or even mention, the neurologist's April 21, 2011, MSS opining that she had daily seizures constitutes reversible error. For purposes of this discussion, the Court will assume Dr. Saeed qualified as a treating physician in this context and that the MSS constituted a medical opinion.

The MSS at issue was a form containing five sections with space for checkmarks. In the first section, "[t]ypes of seizures suffered by this patient," Dr. Saeed placed a checkmark beside

"[c]omplex partial seizures." (D.E. 7-16 at PageID 561.) Next to "[a]pproximate frequency of convulsive seizures," he checked "[d]aily." (*Id.*) Under the heading, "[a]pproximate frequency of non-convulsive seizures," the neurologist marked "[d]aily." (*Id.*) The fourth section, entitled "[e]stimated degree of compliance with treatment," contained a checkmark next to "[g]ood." (*Id.*) A blank next to "[i]ndicate any significant side effects from medications" was filled in with the word "[n]one." (*Id.*) The form was signed and dated by Dr. Saeed on April 21, 2011. (*Id.*)

In reviewing the ALJ's opinion, the Court finds that she did in fact address the MSS, albeit inaccurately. Judge Kimmelman made note in her opinion of Dr. Saeed's July and September 2010 examinations of the Plaintiff. She explained that "[a]t a return visit to Dr. Saeed in April 2011, the claimant reported that she was having daily partial complex seizures, without generalized seizures." (D.E. 7-3 at PageID 54.) The record contains examination notes from claimant's July and September 2010 visits to Dr. Saeed but none from April 2011. Indeed, Plaintiff testified at the hearing before the ALJ that she was last treated by him on September 28, 2010. The Court could locate no evidence in the record of a return visit to Dr. Saeed in April 2011. It appears then from the materials before this Court that the ALJ misidentified the MMS as an examination report in her written decision.

Despite this error, the ALJ did not appear to discount Dr. Saeed's opinion that Mason suffered from frequent seizures as expressed in the MSS, considering she concluded at the second step of the sequential analysis that Plaintiff had a severe combination of impairments that included a seizure disorder. However, mere diagnosis is insufficient to support a claim of disability. *Hill v. Comm'r of Soc. Sec.*, 560 F. App'x 547, 551 (6th Cir. 2014).

In order to survive the third step, a plaintiff must establish that her impairments met or equaled an item on a list of impairments presumed sufficiently severe to render her disabled. *See*

*Taskila*, 819 F.3d at 903. At this stage, the ALJ determined that Mason failed to carry her burden. As previously noted, Dr. Saeed offered no opinion as to the severity or intensity of her seizures, or her ability to perform work. In her reply brief filed in this action, Plaintiff submits that Dr. Saeed's opinion supported a finding that her seizure disorder met or equaled Listings 11.02 and/or 11.03.

The Listing of Impairments, located at Appendix 1 to Subpart P of the Social Security Regulations, describes impairments the Social Security Administration "consider[s] to be severe enough to prevent an individual from doing any gainful activity, regardless of his or her age, education, or work experience." 20 C.F.R. §§ 404.1525(a), 416.925(a); ; *see also Reynolds v. Comm'r of Soc. Sec.*, 424 F. App'x 411, 414 (6th Cir. 2011). Each listing sets forth the "objective medical and other findings needed to satisfy the criteria of that listing." 20 C.F.R. §§ 404.1525(c)(3), 416.925(c)(3). An impairment "meets the requirements of a listing when it satisfies all of the criteria of that listing[.]" 20 C.F.R. §§ 404.1525(c)(3), 416.925(c)(3).

Plaintiff does not maintain that her seizures met Listings 11.02 or 11.03. Rather, it is her position that her impairment equaled the listings. Under the Social Security Regulations, an impairment may be considered medically equivalent to a listed impairment if the claimant does "not exhibit one or more of the findings specified in the particular listing" or, if she exhibits "all of the findings, but one or more of the findings is not as severe as specified in the particular listing." 20 C.F.R. §§ 404.1526(b)(1)(i), 416.926(b)(1)(i). Medical equivalence is found only if the claimant has "other findings related to [her] impairment that are at least of equal medical significance to the required criteria." 20 C.F.R. §§ 404.1526(b)(1)(ii), 416.926(b)(1)(ii). The ALJ, who has the responsibility of determining medical equivalence, is to consider all of the

evidence in the record and its effects on the claimant relevant to that finding. 20 C.F.R. § 404.1526(c), (e); 20 C.F.R. § 416.926(c), (e).

Listing 11.02 is "convulsive epilepsy, (grand mal or psychomotor), documented by detailed description of a typical seizure pattern, including all associated phenomena, occurring more frequently than once a month in spite of at least 3 months of prescribed treatment." 20 C.F.R Pt. 404, Subpt. P, App. 1, 11.02. Seizures under the listing include "[d]aytime episodes (loss of consciousness and convulsive seizures) or . . . [n]octurnal episodes manifesting residuals which interfere significantly with activity during the day." *Id.* Listing 11.03 encompasses

> nonconvulsive epilepsy (petit mal, psychomotor, or focal), documented by detailed description of a typical seizure pattern, including all associated phenomena, occurring more frequently than once weekly in spite of at least 3 months of prescribed treatment, with alteration of awareness or loss of consciousness and transient postictal manifestations of unconventional behavior or significant interference with activity during the day.

20 C.F.R. Pt. 404, Subpt. P, App. 1, 11.03.

Nothing in Dr. Saeed's MSS pointed to findings related to Plaintiff's seizure disorder that were at least of equal medical significance to the required criteria in Listings 11.02 and/or 11.03. She stated in a seizure questionnaire in 2009 that she "blacked out" for a few seconds during her episodes but denied having ever "really totally blacked out" to Dr. Brueggeman a year later, at that time describing them as causing weakness and dizziness for a "minute or two." Dr. Brueggeman reported that she continued to work and "function[ed] pretty well" even when she had five to six seizures per day. At the hearing before the ALJ, she again expressly denied having blackouts, presented no claim or evidence of altered awareness, nocturnal episodes or loss of consciousness and described the experiences, which she asserted occurred every other day during the preceding six months, as dizziness for two to three minutes. Courts are to "generally defer to an ALJ's credibility determination because the opportunity to observe the demeanor of a

witness, evaluating what is said in the light of how it is said, and considering how it fits with the rest of the evidence gathered before the person who is conducting the hearing, is invaluable, and should not be discarded lightly." *Keeton v. Comm'r of Soc. Sec.*, 583 F. App'x 515, 532 (6th Cir. 2014) (internal alterations & quotation marks omitted).

Mason's contention that her seizure disorder equaled the listings is supported neither by the record as a whole nor by Dr. Saeed's sparse MSS in particular. Her assignment of error with respect to Dr. Saeed's MSS is thus without merit.

Severity of Left Knee and Uterine Impairments.

Plaintiff avers that the ALJ improperly failed to consider and find severe her impairments of left knee arthritis and abnormal menses with abdominal pain. As noted above, at step two of the sequential analysis, the Commissioner must determine whether a claimant has a severe impairment or combination of impairments. 20 C.F.R. §§ 404.1520(c), 416.920(c). To be considered "severe," an impairment must "significantly limit[] [the claimant's] physical or mental ability to do basic work activities[.]" 20 C.F.R. §§ 404.1520(c), 416.920(c). In this case, the ALJ found Mason had a severe combination of impairments that included a seizure disorder, minimal degenerative disc disease of the cervical spine,[4] bilateral arthroplasties of hammertoes

---

[4]The claimant takes issue with the ALJ's categorization of her degenerative disc disease as "minimal," citing to the result of her February 22, 2010, chest x-ray, which stated in its entirety as follows:

> The vertebral body heights are maintained without fracture. No subluxation. There is disc space narrowing and anterior osteophyte formation at C6-C7. The neuroforamina are grossly patent bilaterally. The prevertebral soft tissues are within normal limits. The odontoid is intact. Surgical sutures seen in the left lung apex.

(D.E. 7-15 at PageID 490.) The impression was "[n]ormal chest x-ray." (*Id.*) There is no indication in the record that Plaintiff sought or obtained treatment as a result of the x-ray

and status post-removal of a heel spur, and noninsulin-dependent diabetes mellitus.  When the ALJ determines at step two of the analysis that the claimant has some severe impairments and she proceeds to complete steps three through five, it is "legally irrelevant" that her other impairments were considered to be not severe.  *McGlothin v. Comm'r of Soc. Sec.*, 299 F. App'x 516, 522 (6th Cir. 2008); *Mise v. Colvin*, No. 3:15-CV-373-HBG, 2016 WL 3586813, at *5 (E.D. Tenn. June 28, 2016).

Moreover, Plaintiff has failed to explain to the Court, or to the ALJ,[5] how the additional impairments she claims were severe had any effect on her ability to perform work.  Cited portions of the record show diagnoses of mild arthritis in the left knee, treated with ice and over-the-counter pain medication after a fall, and uterine lesions, resolved through an outpatient procedure from which arose no further treatment or complications.  As noted in the previous section, the mere diagnosis of an impairment says nothing about its severity.  *See Hill*, 560 F. App'x at 551.  This claim of error is not well-taken.

Assessment of Side Effects of Medication.

Finally, the claimant maintains that the ALJ erred in failing to consider the side effects of her medications and their effect on her ability to perform work.  In making disability determinations, the Commissioner is to consider the claimant's symptoms.  20 C.F.R. §§ 404.1529(a), 416.929(a).  The Commissioner evaluates the intensity and persistence of symptoms and determines the extent to which they limit the claimant's capacity for work.  20 C.F.R. §§ 404.1529(c), 416.929(c).  Evidence to be considered includes "[t]he type, dosage, effectiveness, and side effects of any medication" used to alleviate those symptoms.  20 C.F.R.

_____

findings.  Nor has she presented argument that this impairment was sufficiently severe to meet or equal one of the listed impairments.

[5]Indeed, the Plaintiff offered no testimony during the hearing before the ALJ, at which she was represented by counsel, concerning either of these impairments.

§§ 404.1529(c)(3)(iv), 416.929(c)(3)(iv).  Allegations of side effects from medications must be supported by objective evidence.  *See Essary v. Comm'r of Soc. Sec.*, 114 F. App'x 662, 665-66 (6th Cir. 2004) (ALJ did not err in finding claimant suffered no side effects where her hearing testimony that she suffered dizziness and drowsiness as a result of her medications conflicted with the medical records, which contained no reports to her physicians of side effects); *see also Lipsey v. Comm'r of Soc. Sec.*, Case No. 1:15-CV-0821, 2016 WL 4253709, at *6 (W.D. Mich. Aug. 12, 2016) (ALJ's failure to address side effects of claimant's medication not reversible error where testimony that his medication made him drowsy found no support in the record, citing *Essary*).

During her testimony before the ALJ, Mason related that her medications made her forgetful, without pointing to any particular drug.  This vague reference is, in the Court's view, insufficient to satisfy the claimant's burden of proof.  Dr. Carpenter noted in May 2005 that Plaintiff's fatigue and numbness of the hands and feet could be caused by her medications, stress, metabolic problems or sleep apnea.  Speculation on the part of her physician falls short of mandating reversal.  *See Haeger v. Colvin*, No. 12 C 4990, 2014 WL 2109353, at *7 (N.D. Ill. May 19, 2014) (ALJ's failure to consider side effects of claimant's medications not error where doctor opined pain medications could have interfered with her ability to concentrate; "[w]here the record does not contain evidence that a claimant is limited by the side effects of her medications, it would be speculation to assume that the claimant automatically suffers from those side effects").  Nothing in the record indicates that she ever complained to her doctors about side effects from her medications.  In fact, she told Dr. Saeed in July 2010, and he opined in his April 2011 MSS, to which claimant has argued herein the ALJ should have accorded complete deference, that she had none.  Therefore, the Court concludes that the ALJ did not err in failing

to discuss Mason's hearing testimony alleging side effects of her medication. *See McMurray v. Colvin*, No. 13-10496, 2014 WL 988938, at *21-22 (E.D. Mich. Mar. 13, 2014) (where only evidence presented by claimant in support of side effects of his medication occurred in his hearing testimony, and record was replete with his specific denials of side effects, ALJ's failure to address side effects was not error) (adopting report & recommendation).

*CONCLUSION*

For the reasons articulated herein, the Commissioner's determination will be AFFIRMED. A separate judgment shall issue.

IT IS SO ORDERED this 12th day of September 2016.

s/ J. DANIEL BREEN
CHIEF UNITED STATES DISTRICT JUDGE